**Kalijarvi, Chuzi, Newman & Fitch, P.C.**
Heidi R. Burakiewicz (*Pro Hac Vice* Application Forthcoming)
Robert DePriest (*Pro Hac Vice* Application Forthcoming)
818 Connecticut Ave. NW, Suite 1000
Washington, DC 20006
Telephone (202) 331-9260
Facsimile (877) 219-7127
hburakiewicz@kcnlaw.com
rdepriest@kcnlaw.com

**Jacobson Law Firm**
570 N. Columbus Blvd., Suite B
Tucson, Arizona 85711
Telephone (520) 834-8034
Facsimile (520) 844-1011
jeff@jacobsonlawfirm.net
Jeffrey H. Jacobson, State Bar No.: 019502

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| BRITTANY MARRISON | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: _____ |
| | : | |
| v. | : | |
| | : | |
| MERRICK GARLAND, | : | |
| in his official capacity as | : | JURY TRIAL DEMANDED |
| ATTORNEY GENERAL OF THE | : | |
| UNITED STATES | : | |
| | : | |
| Defendant. | : | |

//

//

# COMPLAINT

Plaintiff Brittany Marrison alleges as follows against Defendant Merrick Garland and her former employer, the United States Department of Justice, Federal Bureau of Prisons, Federal Correctional Complex Tucson, Arizona ("Agency," "FCC Tucson" or "Defendant"):

# NATURE OF THE CLAIM

1. This action is brought to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* and to remedy discrimination and retaliation Ms. Marrison experienced as a result of her protected activity while she was employed with FCC Tucson, which ultimately resulted in her constructive termination in violation of 5 U.S.C. §§ 2302(b)(1) and 7513.

2. After Ms. Marrison sought counseling and requested an accommodation for her mental health disability on or about June 8, 2018, the Agency subjected Ms. Marrison to a hostile work environment on the basis of her disability and sex and in retaliation for her prior protected activity. Among other things, the Agency: disclosed confidential information about Ms. Marrison's medical/mental health condition; made incorrect, improper, and derogatory statements about Ms. Marrison's mental health in front of coworkers; subjected Ms. Marrison to rumors about her mental health and ability to perform her job; unjustly scrutinized and criticized Ms. Marrison's work; subjected Ms. Marrison to unfounded allegations, baseless investigations, and meritless discipline; threatened Ms. Marrison on multiple occasions; made incorrect, improper, and derogatory statements to Ms. Marrison about her gender; undermined Ms. Marrison's ability to

2

perform her job and negatively affected her coworkers' confidence in her; undermined Ms. Marrison's ability to perform her job and negatively affected her authority with inmates for whom she had to maintain order; and caused Ms. Marrison to fear for her safety.

3. Ms. Marrison's harassers jeopardized her safety and made her fear that she would not be able to depend upon her coworkers in the likely event of an emergency within the dangerous prison environment. Ms. Marrison repeatedly notified managers about the harassment to which she was subjected and the Agency failed to take sufficient corrective action.

4. The Agency's harassment and retaliation became so severe that Ms. Marrison feared for her life and no longer felt safe at her job and was constructively discharged on February 26, 2020.

5. This is a "mixed case" in which Plaintiff will challenge her constructive discharge that involved discrimination and non-discrimination claims. *See* 29 C.F.R. § 1614.302(a)(1) (defining "mixed case complaint" as a complaint of employment discrimination in which the complainant may also raise allegations that the U.S. Merit Systems Protection Board has jurisdiction to address).

6. Through this action, Plaintiff seeks a determination that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964; and constructively discharged her in violation of 5 U.S.C. §§ 2302(b)(1) and 7513. Plaintiff seeks reinstatement, back pay with interest and correction of records, pecuniary and nonpecuniary compensatory damages, and reasonable attorneys' fees and expenses.

## PARTIES

7. Plaintiff is a female citizen with a disability (depression and anxiety). She was employed by Defendant at Federal Correctional Complex Tucson, Arizona from 2013 through February 26, 2020. Plaintiff is a protected person within the meaning of 42 U.S.C. § 2000e-2 and Section 501 of the Rehabilitation Act of 1973.

8. Defendant Merrick Garland, the Attorney General of the United States, has his office in the District of Columbia. He is sued only in his official capacity as the head of the Agency, as required by Title VII. 42 U.S.C. § 2000e-16(c).

9. The United States Department of Justice is an agency of the executive branch of the United States government.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Plaintiff's discriminatory constructive discharge claim pursuant to 5 U.S.C. §§ 7702 and 7703 and 29 C.F.R. § 1614.310(h), and over Plaintiff's Title VII claim pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3) because this is a civil action alleging a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

11. This Court has personal jurisdiction over Defendant Merrick Garland, in his official capacity, because, at all times relevant, Plaintiff worked for Defendant at the Federal Bureau of Prisons, Federal Correctional Complex Tucson, Arizona, within this District, at 9300 South Wilmot Road, Tucson, Arizona 85756.

4

12. Venue is appropriate in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because it is where the events or omissions giving rise to the cause of action occurred.

## EXHAUSTION

13. Plaintiff was constructively discharged from her position through the actions of Defendant, on February 26, 2020

14. Plaintiff timely initiated Equal Employment Opportunity counseling on March 17, 2020, and timely filed her formal complaint of discrimination on June 30, 2020. After the Department of Justice issued a Final Agency Decision on March 9, 2021, Ms. Marrison timely filed an appeal with the U.S. Merit Systems Protection Board ("MSPB" or "Board") on April 8, 2021. Because more than 120 days have passed since Ms. Marrison filed her appeal with the Board and there is no judicially reviewable action, Ms. Marrison is entitled to file this civil action pursuant to 5 U.S.C. § 7702(e)(1).

## FACTS

15. Plaintiff Brittany Marrison is a 39-year old African-American female and United States citizen. She was employed by the Defendant within its Federal Bureau of Prisons at Federal Correctional Complex Tucson, Arizona, from September 22, 2013, until February 26, 2020.

16. Within FCC Tucson, Ms. Marrison worked primarily within United States Penitentiary Tucson ("USP Tucson"). USP Tucson is a high-security prison for male inmates. It is part of the Bureau of Prisons' Sex Offender Management Program ("SOMP") and houses a high number of violent sex offenders.

**Ms. Marrison Was Recognized as an Excellent Employee**

17. In April 2019, the last time she received an annual review, she earned a rating of Excellent, with Outstanding ratings in the individual performance elements of "Supervises Inmates" and "Communicates."

18. Ms. Marrison received multiple performance-based awards, including a Time Off Award on May 27, 2018 for her "professional and sustained commitment to FCC Tucson."

**After Ms. Marrison Sought Counseling and an Accommodation for Her Mental Health Disability, Managers Made Public Comments about Ms. Marrison's Mental Health and Targeted Her for Harassment**

19. In June 2018, Ms. Marrison sought help for her mental health disability. On June 8, 2018, Ms. Marrison asked a supervisor, Lieutenant Rivera, about the availability of stress leave and the process for using it. Ms. Marrison also made use of the Agency's advertised programs and spoke with Employee Assistance Program counselor, Dr. Samantha Licata, about her stress, anxiety, and family concerns.

20. Shortly after Ms. Marrison sought help for her mental health disability, FCC Tucson management disclosed confidential information about her medical and mental health conditions, resulting in widespread rumors about Ms. Marrison's mental health and ability to perform her job. As a result, numerous coworkers made derogatory statements about Ms. Marrison's mental health.

21. Although Ms. Marrison did not discuss her mental health issues with anyone at FCC Tucson other than Lt. Rivera and Dr. Licata, on July 12, 2018, Human Resource Manager Jason Ludwick confronted Ms. Marrison in the lobby of FCC Tucson where many

coworkers were present. Within earshot of her coworkers, HRM Ludwick told Ms. Marrison that she could not work or carry a weapon because she had "such severe mental health issues and might commit suicide." Shortly after, Associate Warden Shawn Salmonson also confronted Ms. Marrison in a crowded lobby and made similar comments.

22. Ms. Marrison repeatedly reported her concerns about these comments to management.

23. Rumors continued circulating among both staff and inmates at FCC Tucson about Ms. Marrison's mental health, which damaged Ms. Marrison's reputation and made her doubt she could rely on coworkers in the likely event of a workplace emergency.

24. Management and coworkers regularly made derogatory comments about Ms. Marrison and unjustifiably questioned her judgment and ability to perform her duties. For example, in approximately December 2018, Lt. Damien Tinnerello told Ms. Marrison she was "too emotional" after she told him a visitor pat search was against policy – Lt. Tinnerello had wanted Ms. Marrison to pat search a female contractor after she had already passed a metal detector, wand scan, and ion scanner.

25. As another example, Warden Jared Rardin called Ms. Marrison "irresponsible and childish" in an October 2019 meeting when she raised her concerns about the Agency's harassment with him.

**The Agency's Harassment Escalated When Managers and Staff Failed to Support Ms. Marrison in Dangerous Situations Involving Inmates at USP Tucson**

26. Ms. Marrison began to fear for her personal safety at work because of the Agency's actions.

7

27. For example, on approximately January 20, 2020, managers returned a broken chair to an inmate in the A-2 housing unit where Ms. Marrison was working. Ms. Marrison had confiscated the chair and written an incident report about the inmate for cutting the legs off the chair – something management informed correctional officers to be on the lookout for because inmates could make weapons from the chair pieces. The inmate knew Ms. Marrison wrote him up and Ms. Marrison reasonably feared that he might use the chair pieces as a weapon against her because of it. Management required Ms. Marrison to continue working near the inmate but never questioned him or conducted any investigation regarding the incident report. Instead, the Unit Manager told Ms. Marrison to "pick her battles."

28. As another example, in approximately January 2020, Inmate Malone, who is a member of the Aryan Brotherhood gang, confronted Ms. Marrison in the B-1 housing unit after she confiscated contraband from him. Specifically, the inmate confronted Ms. Marrison with a group of other inmates and with clenched fists called her "fucking stupid," said he was "going to fucking get her," and made intimidating white supremacist hand gestures towards her. Ms. Marrison wrote up the inmate and he was transferred to the Special Housing Unit, which is a segregation housing unit where inmates are securely separated from the general inmate population.

29. On January 31, 2020, two other inmates who have a history of violent behavior and who associated with Inmate Malone, Inmate Ryan and Inmate Mason, behaved menacingly towards Ms. Marrison while she was working in the B-1 housing unit. For example, the inmates loudly called Ms. Marrison's name, laughed, and taunted her

during her shift. Inmates Ryan and Mason told Ms. Marrison that Lt. Anthony Gallion had told them Inmate Malone was going to be released back to the B-1 housing unit where Ms. Marrison was working, and they told Ms. Marrison that nobody in the institution had her back.

30. Ms. Marrison called Lt. Gallion to confirm that he was planning to release Inmate Malone back to the housing unit and to express her concern that Lt. Gallion notified inmates who associated with Inmate Malone rather than Ms. Marrison directly. Lt. Gallion responded by telling Ms. Marrison she was being overly upset and could not handle the job because she was a girl and because of her mental health issues.

31. The next day, on February 1, 2020, Inmate Ryan and Inmate Mason stood shirtless with their arms erect in a Nazi salute gesture while Ms. Marrison passed by to perform the official inmate count.

**Ms. Marrison Repeatedly Reported that She Was Being Harassed and the Agency Failed to Support Her, Resulting in Her Constructive Discharge**

32. On February 1, 2020, Ms. Marrison submitted a memorandum to Lt. Gallion in which she reported the inmates' behavior, asked him to reconsider the decision to release Inmate Malone back to general population, and begged to be assigned to a different post. She rebutted his assertion from the day before and emphasized that her perception of the incident "was legitimate as a reasonabl[e] officer and not because of a female perspective."

33. Ms. Marrison notified other members of management that she did not feel safe, but they did not respond and continued to assign her to the B-1 Housing Unit post where the inmates who were threatening her lived.

34. Ms. Marrison emailed upper management at FCC Tucson, including the Captain and Warden, notifying them of the harassment, management's failure to support her, and pleading not to be assigned to work in that housing unit, but neither manager responded.

35. Ms. Marrison tried to switch shifts with her coworkers so she would not have to work near the threatening inmates, but it was not always possible.

36. On February 10, 2020, Ms. Marrison submitted a memorandum and packet of information to then-Complex Warden Barb von Blanckensee in which she explained she was being targeted because of her gender and disability, and that she was being retaliated against for her protected reporting.

37. Ms. Marrison was in a near-constant state of fear for her safety at work. She made the only available decision, that she could not continue, and on February 26, 2020, was constructively discharged from the career she once loved and the institution where she had planned to work until she retired.

## STATEMENT OF THE CLAIMS

## COUNT I

**Hostile Work Environment and Discrimination on the Basis of Disability and Sex in Violation of Title VII of the Civil Rights Act of 1964, as Amended**

38. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint.

39. Between June 2018 and February 26, 2020, the Agency subjected Ms. Marrison to a hostile work environment, which culminated in her constructive discharge, on the basis of her disability and sex. Among other things, the Agency: disclosed

confidential information about Ms. Marrison's medical/mental health condition; made incorrect, improper, and derogatory statements about Ms. Marrison's mental health in front of coworkers; subjected Ms. Marrison to rumors about her mental health and ability to perform her job; unjustly scrutinized and criticized Ms. Marrison's work; subjected Ms. Marrison to unfounded allegations, baseless investigations, and meritless discipline; threatened Ms. Marrison on multiple occasions; made incorrect, improper, and derogatory statements to Ms. Marrison about her gender; undermined Ms. Marrison's ability to perform her job and negatively affected her coworkers' confidence in her; undermined Ms. Marrison's ability to perform her job and negatively affected her authority with inmates for whom she had to maintain order; and caused Ms. Marrison to fear for her safety.

40. The harassment directed at Ms. Marrison was because of her sex and disability and often explicitly referenced her sex and disability.

41. The overall circumstances and harassment were so severe and pervasive as to substantially and negatively alter the terms and conditions of Ms. Marrison's employment with the Agency, creating a hostile and abusive work environment.

42. As a direct and proximate result of Defendant's discrimination, Ms. Marrison lost her employment and suffered damages for which she should be compensated in an amount to be determined at trial.

## COUNT II

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as Amended**

43. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint.

44. As set forth in the numbered paragraphs above, Ms. Marrison engaged in conduct protected by Title VII when she sought an accommodation for her disability by requesting stress leave; when she reported the Agency's improper disclosure of her mental health conditions to FCC Tucson management; when she reported to FCC Tucson management that she was being harassed by other managers and staff; and when she reported to FCC Tucson management that she was being threatened by inmates.

45. As a result of Ms. Marrison engaging in this protected activity, the Defendant retaliated against her through a series of materially adverse actions that would dissuade a reasonable person from engaging in protected activity. These retaliatory actions, which culminated in her constructive discharge, included, among other things: disclosing confidential information about Ms. Marrison's medical/mental health condition; making incorrect, improper, and derogatory statements about Ms. Marrison's mental health in front of coworkers; subjecting Ms. Marrison to rumors about her mental health and ability to perform her job; unjustly scrutinizing and criticizing Ms. Marrison's work; subjecting Ms. Marrison to unfounded allegations, baseless investigations, and meritless discipline; threatening Ms. Marrison on multiple occasions; making incorrect, improper, and derogatory statements to Ms. Marrison about her gender; undermining Ms. Marrison's ability to perform her job, negatively affecting her coworkers' confidence in her; undermining Ms. Marrison's ability to perform her job, negatively affecting her authority with inmates for whom she had to maintain order; and causing Ms. Marrison to fear for her safety.

46. In addition to other direct and circumstantial evidence of motive such as comments made by FCC Tucson managers, the temporal proximity between Ms. Marrison's protected activity and the Defendant's retaliatory actions demonstrates causal connection.

47. As a direct and proximate result of the retaliation to which she was subjected, Ms. Marrison lost her employment and suffered damages for which she should be compensated in an amount to be determined at trial.

## COUNT III

### Constructive Discharge

48. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint.

49. As a result of Ms. Marrison's disability, sex, and prior protected activity, the Agency took materially adverse actions against her, including, among other things: disclosing confidential information about Ms. Marrison's medical/mental health condition; making incorrect, improper, and derogatory statements about Ms. Marrison's mental health in front of coworkers; subjecting Ms. Marrison to rumors about her mental health and ability to perform her job; unjustly scrutinizing and criticizing Ms. Marrison's work; subjecting Ms. Marrison to unfounded allegations, baseless investigations, and meritless discipline; threatening Ms. Marrison on multiple occasions; making incorrect, improper, and derogatory statements to Ms. Marrison about her gender; undermining Ms. Marrison's ability to perform her job, negatively affecting her coworkers' confidence in her; undermining Ms. Marrison's ability to perform her job, negatively affecting her authority

with inmates for whom she had to maintain order; and causing Ms. Marrison to fear for her safety.

50. As a result of Ms. Marrison's sex, disability, and in retaliation for her prior protected activity, Defendant made her working conditions so intolerable that a reasonable employee would feel compelled to resign.

51. As a direct and proximate result of Defendant's actions, Ms. Marrison was constructively discharged on February 26, 2020, lost her employment, and experienced injuries and incurred damages for which she is entitled to compensation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against the Defendant as follows:

A. Declare that the Defendant violated the Plaintiff's rights under Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and 5 U.S.C. §§ 2302(b)(1) and 7513;

B. Order the Defendant to adopt and implement policies, procedures, and practices that will protect employees from harassment on the basis of sex and disability and protect employees from retaliation for engaging in protected activity;

C. Reinstate Plaintiff with full backpay, interest benefits, and correction of records;

D. Award Plaintiff pecuniary and non-pecuniary compensatory damages;

E. Order the Defendant to pay the Plaintiff's reasonable attorneys' fees, costs, and expenses; and

F. Order all other legal and equitable relief as many be just and proper.

**JURY DEMAND**

Plaintiff requests a jury trial for all claims that may be tried to a jury.

Respectfully submitted this 18th day of November, 2021.

**JACOBSON LAW FIRM**

*s/ Jeffrey H. Jacobson*
JEFFREY H. JACOBSON
*Attorney for Plaintiff*

Filed via the CM/ECF system this 18th day of November, 2021